# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| KALISHA THOMAS, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) Civil Action No. 18-0125 (ABJ) |
|  | ) |
| SECURIGUARD INC., | ) |
|  | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff Kalisha Thomas brought this action against Securiguard, Inc., her former employer, claiming that she was subjected to sexual harassment, discrimination, and retaliation, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* (2012), and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401 *et seq.* Securiguard is a private contractor that provides security services at buildings including federal office buildings. During her employment with Securiguard, plaintiff worked as a Special Police Officer ("SPO") at the Thurgood Marshall Federal Judiciary Building, home of the Administrative Office of the United States Courts ("AOUSC"). Plaintiff alleges that an employee of the Administrative Office, John Glover, who was also stationed at the Marshall Building, sexually harassed her on a near daily basis. She claims that after she reported Glover's conduct to her superiors, she experienced additional discrimination and retaliation.

Defendant has moved for summary judgment on all counts. Def.'s Mot. for Summ. J. [Dkt. # 20] ("Def.'s Mot."). It argues, among other things, that the conduct at issue was not sufficiently severe or pervasive to create a hostile work environment, and that it has supplied legitimate, non-

discriminatory reasons for all of the actions it took. Def.'s Mem. in Supp. of Def.'s Mot. [Dkt. # 20-3] ("Def.'s Mem."). Plaintiff opposed the motion. Pl.'s Opp. to Def.'s Mot. [Dkt. # 24] ("Pl.'s Opp.").

While this is a close case, and plaintiff may face significant challenges at trial, the Court will deny in part and grant in part defendant's motion for summary judgment since the issues in dispute are questions of fact that must be decided by a jury.

## BACKGROUND

In September 2015, Securiguard Inc. ("SGI" or "defendant") was awarded a contract to provide physical security services at the Thurgood Marshall Federal Judiciary Building (the "Marshall Building"), located at One Columbus Circle, N.E., Washington, D.C. 20544. Def.'s Statement of Undisputed Material Facts [Dkt. # 20-1] ("Def.'s SUMF") ¶ 1. This contract provided for both stationary and roving security officers in the building. *Id.* ¶ 3.

Plaintiff Kalisha Thomas ("plaintiff" or "Thomas") was an armed SPO who had worked at the Marshall Building since approximately 2011, under different security companies. Plaintiff's Statement of Facts [Dkt. # 24-42] ("Pl.'s SF") ¶ 2. Before SGI, plaintiff was employed by U.S. Security Associates. Def.'s SUMF ¶ 35. When she was employed by U.S. Security Associates, she held a position called "Victor 2" from which she would fill in as a supervisor when needed, although this position did not carry additional pay or benefits. *Id.* ¶ 42; Dep. of Kalisha Thomas, Ex. 1 to Pl.'s Opp. [Dkt. # 24-1] ("Thomas Dep.") at 84:19–85:5. The Victor 2 position was not an official position under SGI's contract, although SGI continued to use the title. Dep. of John Fitzgerald Glover, Ex. 17 to Pl.'s Opp. [Dkt. # 24-17] ("Glover Dep.") at 119:12–17; Dep. of Leslie Howard-Watts, Ex. 3 to Pl.'s Opp. [Dkt. # 24-3] ("Howard-Watts Dep.") at 89:3–18; Dep. of Perry Delvin Shumake, Ex. 5 to Pl.'s Opp. [Dkt. # 24-5] ("Shumake Dep.") at 69:9–70:3.

On October 24, 2015, after SGI was awarded the contract, it hired plaintiff as an incumbent security guard. Def.'s SUMF ¶ 35. Her base pay rate upon transfer to SGI was $26.90 per hour, and she received additional employee benefits such as health and pension plan contributions. *Id.* ¶ 38. When SGI hired plaintiff, it gave her the SGI Employee Handbook and SGI policies on topics such as employment discrimination and sexual harassment. Plaintiff acknowledged the receipt of these materials on October 15, 2015. Def.'s SUMF ¶ 36. All SGI employees at the Marshall Building were represented by the United Government Security Officers of America International Union, Local 276 ("the Union"). *Id.* ¶ 34. Plaintiff worked for SGI between October 24, 2015 and September 15, 2016. *Id.* ¶ 35; Decl. of Leslie Howard-Watts, Ex. A to Def.'s Mot. [Dkt. # 20-4] ("Howard-Watts Decl.") at SGI 000612.

Since 2001, John Glover has worked as a physical security specialist for the AOUSC at the Marshall Building. Def.'s SUMF ¶ 9. Glover was not an employee of SGI. *See* Glover Dep. at 12:9–14. He served as the liaison between the AOUSC and SGI and functioned as the Contracting Officer's Representative ("COR"). Glover Dep. at 36:6–10. He was supervised by Scott Ellermets, the Chief of the Administrative Services Division. *Id.* at 23:1–7.

Glover's area of responsibility was physical security, which entailed purchasing physical equipment and overseeing the daily operations of the physical security staff, including the contractors. *Id.* at 29:15–21. He was also tasked with enforcing policies and procedures, responding to emergency incidents, and ensuring that the security staff were performing in compliance with the contract. *Id.*; Def.'s SUMF ¶ 18. As Glover put it, in carrying out his responsibilities, he would physically walk the areas of the building to ensure that security posts were manned and performance deficiencies were kept to a minimum. Glover Dep. at 30:9–32:18.

Under SGI's contract with the AOUSC, SGI must report any disciplinary actions taken against security personnel at the Marshall Building to the COR. Def.'s SUMF ¶ 7.

On November 30, 2015, SGI hired Major Tracey Hayes as the Project Manager in charge of security at the AOUSC in the Marshall Building. Aff. of Major Tracey Hayes, Ex. 7 to Pl.'s Opp. [Dkt. # 24-7] ("Hayes Aff.") ¶¶ 2, 4. She oversaw between forty-five and fifty special police officers, three supervisory lieutenants, and one captain. *Id.* ¶ 3. Hayes worked closely with Glover – they met weekly to discuss the physical security of the building. Hayes Aff. ¶ 5. During the time plaintiff worked for SGI, Major Hayes was one of her supervisors. Plaintiff also reported to Lieutenant Michelle Lee-Anthony and Captain David Grogan. Thomas Dep. at 45:8–9 (indicating that Grogan was one of her supervisors); *id.* at 59:10–11 (indicating Lieutenant Lee-Anthony was one of her supervisors).

Plaintiff has known Glover since she started working at the Marshall Building in approximately 2012. Thomas Dep. at 32:13–21. Plaintiff is openly gay, *id.* at 25:19–26:9, and she believes that others at the Marshall Building knew she was gay. *Id.* at 30:21–31:15. She asserts that throughout the time she was employed by SGI, Glover harassed her at least two to three times a week. *Id.* at 52:17–53:20. The harassment included referring to plaintiff as "sir"; calling her a "man"; making comments about how masculine or mannish she was; calling her a "playboy" and commenting that she must have a lot of girlfriends; and laughing at her while shaking his head in a manner that made her feel uncomfortable. *Id.* at 41:18–58:17, 68:14–71:20.

SGI took over the Marshall Building contract, and plaintiff became its employee at the end of October 2015. Def.'s SUMF ¶ 35. Plaintiff states that she complained about Glover's conduct soon after SGI took over the contract by informing Lieutenant Lee-Anthony and Captain Grogan. Thomas Dep. at 44:22–47:17; *see* Lee-Anthony Dep., Ex. 4 to Pl.'s Opp. [Dkt. # 24-4] ("Lee-

Anthony Dep.) at 41:8–43:13; Shumake Dep. at 99:10–14 (Grogan left SGI shortly after February 2016). Plaintiff also testified that she complained about Glover to the Project Manager, Major Hayes, on at least two occasions: before January 15, 2016, and again on that date. Thomas Dep. at 98:5–17, 274:5–11; Hayes Aff. ¶ 14 (meeting with Thomas occurred on Jan. 15, 2016).

On January 15, 2016, Major Hayes decided to remove plaintiff from the Victor 2 position. Hayes Aff. ¶ 14. Hayes testified that there were several reasons for the removal: the Victor 2 position would now require work on Fridays, when plaintiff did not want to work; plaintiff had told Major Hayes that she had a history with Glover and did not get along with him; Glover and Lieutenant Michelle Lee-Anthony had reported that plaintiff had a sarcastic demeanor on one occasion; Major Hayes was of the view that removing plaintiff from the position would reduce the interactions with Glover; and Major Hayes was concerned that plaintiff could not respect certain confidentiality rules. *Id.*; 2/11/16 Hayes Handwritten Note, Ex. 33 to Pl.'s Opp. [Dkt. # 24-33] ("Hayes's Note") at SGI 000163; Dep. of Major Tracey Hayes, Ex. 6 to Pl.'s Opp. [Dkt. # 24-6] ("Hayes Dep.") at 58:1–62:5. Plaintiff would remain a Special Police Officer for the Marshall Building, though.

Plaintiff filed an EEOC complaint on February 16, 2016, alleging discrimination and retaliation based on sex. Notice of Charge, Ex. 11 to Pl.'s Opp. [Dkt. # 24-11] ("EEOC Compl."). She wrote that she had been harassed by Glover for years because of her sexuality, and that she had been removed from the Victor 2 position at the request of Glover. *Id.* SGI was notified about the complaint on approximately February 17, 2016, when the EEOC emailed the Notice of Charge to Leslie Howard-Watts, SGI's Human Resources Director. 2/17/16 Email from EEOC to Howard-Watts, Ex. 12 to Pl.'s Opp. [Dkt. # 24-12]. The record does not indicate that SGI opened an official investigation – there is some testimony that Howard-Watts spoke to plaintiff about the

allegations, and Howard-Watts understood that the legal department was informed. Howard-Watts Dep. at 75:8–77:13.

On June 3, 2016, plaintiff sent an email to her Union Representative, Brian Howard, in which she reiterated her complaints about Glover and added that she believed Glover was trying to "intimidate and provoke" her. Def.'s SUMF ¶ 52. She described a particular day, when Glover walked by her post four times while laughing and shaking his head, and she wrote that she did not feel comfortable in her workplace. Howard-Watts Decl. at SGI 000266–67. On June 6, 2016, the email was forwarded to Howard-Watts who stated that she would look into it. *Id.* at SGI 000265. The Senior Operations Manager at SGI, Perry Shumake, reviewed video footage from that day, but in his assessment, the video did not substantiate the claims: it was either too blurry or Glover was out of the frame. 6/7/16 Email from Shumake to Howard-Watts, Ex. E to Def.'s Mot. [Dkt. # 20-8] at SGI 000374. SGI notes that Howard-Watts and Shumake interviewed Glover and put his supervisor on notice of the allegations against him. Howard-Watts Dep. at 160:22–62:13; *see also* Glover Dep. at 93:3–94:2 (indicating that he suggested that Shumake review the video tapes). Howard-Watts notified the President and CEO of SGI, Patricia Marvil, of the complaint. 6/6/16 Email from Howard-Watts to Marvil, Ex. 16 to Pl.'s Opp. [Dkt. # 24-16]. She also notified an employee in the Fair Employment Practices Office at the AOUSC. *See* Howard-Watts Decl. ¶ 4; Howard-Watts Dep. at 126–27:14, 129:8–13.

On June 10, 2016, Howard-Watts informed plaintiff that SGI would transfer her to the Library of Congress,[1] and that her pay rate would remain the same although SPOs at the Library of Congress were generally paid less than those at the Marshall Building. Thomas Dep. at 112:12–

---

1    Howard-Watts also testified that she offered plaintiff a transfer to other SGI sites, like the Kennedy Center. Howard-Watts Dep. at 86:1–12. But she felt that the Library was best suited for her "based on the hours worked and the distances she would have to travel." *Id.*

113:16; Ex. C to Def.'s Mot., Excerpts of Thomas Dep. & Attachments [Dkt. # 20-6] ("Def.'s Ex. C") at SGI 000384–85; Ex. D to Def.'s Mot., Excerpts of Howard-Watts Dep. & Attachments [Dkt. # 20-7] ("Def.'s Ex. D") at SGI 000380. Plaintiff took about a week to consider the decision and attended training classes for the Library of Congress position, Howard-Watts Decl. at SGI 000276–79, but she ultimately decided that she did not want to transfer. Thomas Dep. at 129:9–20; *see* Howard-Watts Decl. at SGI 000387.

On June 30, 2016, plaintiff emailed Howard-Watts that she would pick up her check and return her uniform, and stated: "For the record, I did not resign." Def.'s Ex. D at SGI 000433 ("6/30/16 Howard-Watts Email"). Howard-Watts responded, stating: "Refusing an assignment that is comparable to what you are currently working is the same as resigning. You are making the decision to discontinue employment with SGI." *Id.*

On July 5, 2016, the Union filed a grievance on plaintiff's behalf based on her removal from the Marshall Building. Howard-Watts Decl. at SGI 000281. On August 5, SGI and plaintiff reached a settlement agreement, in which all claims related to her employment were resolved, and plaintiff was reinstated to the Marshall Building. Def.'s Ex. C at SGI 000228–34 ("Settlement Agreement").[2] Pursuant to the agreement, plaintiff withdrew her EEOC charge on August 8. Request for Withdrawal of Charge of Discrimination, Ex. F to Def.'s Mot. [Dkt. # 20-9].

On August 9, 2016, the Human Resources Director, Howard-Watts, informed Major Hayes that plaintiff had been reinstated and that she was uniformed on that day. Howard-Watts Decl. at SGI 000284. On August 12, Howard-Watts informed Glover that plaintiff had been reinstated. *Id.*

---

2    The settlement agreement released SGI to every claim arising up to the date that plaintiff signed the agreement which was on August 5, 2016. She agreed to release any rights and relief under Title VII and the DCHRA up to this date. *See* Settlement Agreement at SGI 000229. Defendant has made not made any arguments related to the waiver of claims covered by the settlement agreement.

at SGI 000215. On August 17, Glover responded to the email, stating that a "request to add her to the contractor database has been placed" and that he would "schedule her for a suitability check." Howard Watts Decl. at SGI 000239; Def.'s SUMF ¶ 93. The "suitability check" was a requirement imposed by the AOUSC for all officers assigned to the AOUSC location. Glover Dep. at 47:18–21; Def.'s SUMF ¶ 94. All of plaintiff's fellow security guards underwent the suitability determination. Thomas Dep. at 179:11–21. Glover was not responsible for determining suitability; his role was limited to scheduling the suitability background checks with the Human Resources Department at the AOUSC. Def.'s SUMF ¶ 97.

The suitability evaluator in this case was Carla Harris, who worked in Human Resources at the AOUSC. *Id.* ¶ 99. She had never met plaintiff before. *Id.* ¶ 100. As part of the evaluation, plaintiff had to fill out a form entitled "Declaration for Federal Employment" that asked a number of questions about her background. Howard Watts Decl. at SGI 000258–59. On that form, plaintiff answered "yes" to two questions:

- During the last 5 years, have you been fired from any job for any reason, did you quit after being told that you would be fired, did you leave any job by mutual agreement because of specific problems or were you debarred from Federal employment by the Office of Personnel Management or any other Federal agency?

- Are you delinquent on any Federal debt?

*Id.* She explained later in the form: "On June 17[,] 2016 I was removed from [the Marshall Building] because I refused to be transferred to another site by Securiguard Inc. Securiguard did an automatic resignation." *Id.*

On September 14, 2016, the AOUSC faxed Securiguard an Employment Verification form to fill out, asking for "clarifying comments" regarding plaintiff's separation from SGI. SGI filled out one portion of the form, stating that plaintiff was employed at SGI from "11/01/2015" to "On

leave 6/13/2016." *Id.* at SGI 000256–57. The rest of the form was rubber stamped: "COMPANY POLICY PRECLUDES PROVIDING ANY INFORMATION OTHER THAN DATES OF EMPLOYMENT AND POSITIONS HELD." *Id.*

On September 15, 2016, Harris of the AOUSC Human Resources Department determined that plaintiff was unsuitable. Ex. G to Def.'s Mot., Marvil Dep. Excerpts & Attachments [Dkt. # 20-10] at SGI 000567; Howard-Watts Decl. at SGI 000248. Plaintiff called Harris to inquire about the basis for her decision, and Harris informed her that it was because she had been terminated in June of 2016. Howard-Watts Decl. at SGI 000203–04. Plaintiff then asked the Human Resources Director at SGI, Howard-Watts, to contact Harris to clarify what had taken place at that time. *Id.*

On September 21 and 23, Howard-Watts contacted Glover regarding the suitability determination. She informed him that plaintiff had not been terminated the previous June, but that she had been placed on a leave of absence, and that if the determination was made because the AOUSC thought she was terminated, it was wrong and should be corrected. *Id.* at SGI 000203. Glover responded that the suitability adjudicator, in this case, Harris, "makes the conclusive determination and the determination is not subject to review," and that "[c]ontractors are not guaranteed by policy to any specific due process." *Id.* at SGI 000250. Darlene Thomas, Harris's supervisor, Dep. of Carla Michele Harris, Ex. 28 to Pl.'s Opp. [Dkt. # 24-28] ("Harris Dep.") at 26:17–27:10, contacted Howard-Watts, informing her that they did not need any further information, and that the "decision pertaining to her suitability will not be revisited." Howard-Watts Decl. at SGI 000202.

On September 23, 2016, Howard-Watts informed plaintiff of the AOUSC's response, and stated that the action was now beyond her control and that she would be unable to assist any further.

*Id.* at SGI 000201.  That same day, Howard-Watts sent a letter to plaintiff, stating that because of her negative suitability determination, she was being separated from Securiguard effective September 15, 2016.  *Id.* at SGI 000612.

Plaintiff alleges that in the Spring of 2017, she sought defendant's cooperation with providing documentation that was needed for plaintiff to maintain her Armed Special Police Officer license.  Thomas Dep. at 147:12–149:14.  On April 25, 2017, union president Brian Howard asked Howard-Watts to provide the transfer paperwork, and he avers that Howard-Watts told him that she would speak with plaintiff about it, Decl. of Brian Howard, Ex. 21 to Pl.'s Opp. [Dkt. # 24-21] ("Howard Decl.") ¶¶ 11–12, but Howard-Watts testified that she was not aware of plaintiff's request.  Howard-Watts Dep. at 167:12–169:17.  The paperwork was not transferred, and plaintiff alleges that because of defendant's failure, her license expired on May 31, 2017, and she was required to re-apply, as if she had never had one before.  Thomas Dep. at 157:21–158:4.

On January 22, 2018, plaintiff filed a lawsuit in this court against Securiguard, alleging violations of Title VII and the DCHRA, including hostile work environment, discrimination based on sex and sexual orientation, and retaliation.  Compl. [Dkt. # 1] ¶¶ 38–52.  On February 4, 2019, SGI moved for summary judgment.  Def.'s Mot.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary

judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

**I. The Federal Enclave Doctrine does not apply.**

Defendant argues that the D.C. Human Rights Act is inapplicable to this case because the events giving rise to the causes of action took place in a federal government building that is a federal enclave in which state laws do not apply. Defendant argues that its motion for summary judgment should be granted as to the DCHRA claims on this basis. Def.'s Mem. at 9.

The Federal Enclave Doctrine finds its authority in the Supremacy Clause of the Constitution:

> [Congress shall have the power] [t]o exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings

U.S. Const. art. I, § 8, cl. 17.  In *Goodyear Atomic Corp. v. Miller*, the Supreme Court explained that the doctrine establishes that "a federally owned facility performing a federal function is shielded from direct state regulation, even though the federal function is carried out by a private contractor, unless Congress clearly authorizes such regulation."  486 U.S. 174, 181 (1988). Essentially, where Congress purchases land from a state, that state loses legislative authority over these "enclaves" unless reserved or authorized by Congress.  *Id.*; *ITEL Corp. v. District of Columbia*, 448 A.2d 261, 264 (D.C. 1982) (noting mere acquisition without state's consent insufficient to trigger enclave exemption).  The purpose of the exemption is to distance federal functions from excessive state influence or interference.  *See* Michael J. Malinowski, *Federal Enclaves and Local Law: Carving Out A Domestic Violence Exception to Exclusive Legislative Jurisdiction*, 100 Yale L.J. 189, 193 (1990), *citing* The Federalist No. 43, at 273 (J. Madison) (C. Rossiter ed. 1961).

Defendant's motion does not require the dismissal of the DCHRA counts.  First, it cites no authority holding that the DCHRA does not apply to private employers working within a federal building.  The few cases defendant identifies all concern sites where the state expressly consented to the transfer of property and relinquished jurisdiction.  *See e.g.*, *Vincent v. Gen. Dynamics Corp.*, 427 F. Supp. 786, 795 (N.D. Tex. 1977) (Texas governor executed deed of cession recognizing exclusive federal jurisdiction over parcels acquired from City of Fort Worth for air force plant); *see also Sundaram v. Brookhaven Nat. Labs.*, 424 F. Supp. 2d 545, 570 (E.D.N.Y. 2006) (where the federal government purchased a research lab in the State of New York, and where the deed granted exclusive federal jurisdiction over the land, the NY state human rights law did not apply to activities that occurred on the property).

But more fundamentally, the District is not a state, and Congress has, at least passively, authorized D.C. to regulate the workplace. Its local laws are passed by the Council of the District of Columbia, which was created by Congress under the Home Rule Act in 1973. Congress delegated its legislative authority to the Council, and it reserved for itself thirty days to reject any proposed law before automatic passage. *See* D.C. Code §§ 1-201.02(a), 1-206.02(c)(1) (2012). The District's legislation is thereby authorized by Congress. The federal enclave would therefore not apply to exempt federal buildings from D.C. local law.

Defendant argues that Congress restricted the Council from enacting any law "which concerns the *functions or property of the United States* or which is not restricted in its application exclusively in or to the District." D.C. Code § 1-206.02(a)(3) (defendant's emphasis). But the DCHRA concerns neither the functions nor the property of the United States – the law's purpose is only to "secure an end in the District of Columbia to discrimination." D.C. Code § 2-1401.01. Furthermore, this provision of the D.C. Code was intended to proscribe laws with potential national implication. *See District of Columbia v. Greater Washington Cent. Labor Council, AFL-CIO*, 442 A.2d 110, 116 (D.C. 1982) (noting authors' intent to safeguard national operations like legislative administration and federal physical planning).

As the D.C. Court of Appeals noted in *ITEL Corporation*:

> The District of Columbia is treated differently from federal enclaves within state boundaries, such as various military bases. Within state boundaries, federal enclaves are areas owned by the federal government and purchased with the consent of the state legislature. . . . [A]ll parts of the District of Columbia are within exclusive congressional jurisdiction, regardless of whether they are privately- or federally-owned. If a presumption or implied exemption is to be derived from Article I, it would have to apply to the entire District.

448 A.2d at 264. Such a result would surely be at odds with the D.C. Council's authority to pass local statutes. Thus, defendant has not established that an employer's conduct at the Marshall

Building is exempted from D.C. local regulation, and plaintiff's claims can proceed under both the DCHRA and Title VII.

## II. Discrimination based on gender stereotyping is actionable under Title VII.

Defendant argues that plaintiff's discrimination claims fail as a matter of law because the D.C. Circuit has not ruled that discrimination based upon sexual orientation or based on a failure to conform to traditional gender stereotypes is proscribed by Title VII. Def.'s Mem. at 10–12.

But contrary to defendant's contention, it is well established that gender stereotyping can form the basis of a discrimination claim under Title VII. In *Price Waterhouse v. Hopkins*, the Supreme Court accepted the district court's finding that a woman had suffered discrimination in the form of sex stereotyping when she was not considered for partnership because she did not walk, dress, and style herself in a traditional "feminine" fashion. 490 U.S. 228, 235 (1989). After *Price Waterhouse*, numerous federal courts concluded that punishing employees for failure to conform to sex stereotypes is actionable sex discrimination under Title VII. *See, e.g.*, *Medina v. Income Support Div.*, 413 F.3d 1131, 1135 (10th Cir. 2005) ("[A] plaintiff may satisfy her evidentiary burden [under Title VII] by showing that the harasser was acting to punish the plaintiff's noncompliance with gender stereotypes."); *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 264 (3d Cir. 2001) (Title VII claim is stated when "the harasser was acting to punish the victim's noncompliance with gender stereotypes"); *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 870 (9th Cir. 2001) (male plaintiff stated a Title VII claim where he was harassed "for walking and carrying his serving tray 'like a woman'" – *i.e.*, for having feminine mannerisms); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261 n.4 (1st Cir. 1999) ("Just as a woman can ground an action on a claim that men discriminated against her because she did not meet stereotyped expectations of femininity, a man can ground a claim on evidence that other men discriminated

against him because he did not meet stereotypical expectations of masculinity."); *Doe v. City of Belleville*, 119 F.3d 563, 581 (7th Cir. 1997) ("[A] man who is harassed because his voice is soft, his physique is slight, his hair is long, or because in some other respect he . . . does not meet his coworkers' idea of how men are to appear and behave, is harassed 'because of' his sex."), *vacated and remanded on other grounds*, 523 U.S. 1001 (1998).

Courts in this district have also recognized that gender stereotyping, regardless of sexual orientation, can be a basis for Title VII discrimination. *See Creese v. District of Columbia*, 281 F. Supp. 3d 46, 53 (D.D.C. 2017); *Holmes v. Univ. of the D.C.*, 244 F. Supp. 3d 52, 65 (D.D.C. 2017); *Terveer v. Billington*, 34 F. Supp. 3d 100, 116 (D.D.C. 2014); *Robertson v. Dodaro*, 767 F. Supp. 2d 185, 193 (D.D.C. 2011); *Nuskey v. Hochberg*, 657 F. Supp. 2d 47, 58 (D.D.C. 2009); *Kimmel v. Gallaudet Univ.*, 639 F. Supp. 2d 34, 41 (D.D.C. 2009); *Schroer v. Billington*, 577 F. Supp. 2d 293, 303 (D.D.C. 2008).

While the D.C. Circuit has not yet addressed the question of whether discrimination based on sexual orientation, standing alone, is covered by Title VII,[3] the Court need not decide the issue in this case because the discrimination alleged falls squarely within the legally recognized category of gender stereotyping discrimination. The comments forming the basis of plaintiff's claim all draw attention to a perceived lack of "femininity" in accordance with Glover's standards. Thus, plaintiff may proceed with her Title VII gender discrimination claims, and the Court will not grant summary judgment in favor of the defendant on this basis.

---

3       Both the Second and Seventh Circuits have recently recognized sexual orientation as a basis for Title VII discrimination. *See Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 132 (2d Cir. 2018); *Hively v. Ivy Tech*, 853 F.3d 339, 351–52 (7th Cir. 2017). This issue is currently pending before the Supreme Court. *See Altitude Express, Inc. v. Zarda*, 139 S.Ct. 1599 (2019) (granting petition for writ of certiorari).

## III. Discrimination

In Count I, plaintiff alleges that she was discriminated against on the basis of her gender. A plaintiff establishes a *prima facie* case of gender discrimination by showing that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007).[4]

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court set out a three-pronged burden shifting framework to be used when analyzing discrimination claims under Title VII. First, the employee must establish a *prima facie* case of discrimination. If the employee is able to do so, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for its action. If the employer meets its burden, the burden shifts back to the employee to prove that the reason stated was mere pretext and that she suffered intentional discrimination. *Id.* at 802–04; *Figueroa v. Pompeo*, 923 F.3d 1078, 1086 (D.C. Cir. 2019). However,

> [i]n a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not – *and should not* – decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*.

*Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). Particularly at summary judgment, the "general expectation [is] that . . . the District Court will focus on the third prong." *Figueroa*, 923 F.3d at 1086.

---

4      The D.C. Court of Appeals generally interprets the D.C. Human Rights Act as operating in parallel to Title VII. *See, e.g.*, *Estenos v. PAHO/WHO Fed. Credit Union*, 952 A.2d 878, 886 (D.C. 2008) (observing that the D.C. Court of Appeals "follow[s] cases construing Title VII in interpreting and applying the provisions of the [D.C. Human Rights Act] . . . to the extent that the acts use similar words and reflect a similar purpose").

Thus, where the employer has provided a legitimate non-discriminatory reason for its action, the central question becomes whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff. The Court considers this question "'in light of the total circumstances of the case,' asking 'whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer.'" *Evans v. Sebelius*, 716 F.3d 617, 620 (D.C. Cir. 2013), quoting *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012).

Plaintiff alleges that five events amounted to adverse employment actions on the part of SGI: (1) the loss of the Victor 2 position; (2) the removal from the Marshall Building; (3) the placement on unpaid leave; (4) SGI's role in the suitability determination; and (5) the termination. Compl. ¶ 38; Pl.'s Opp. at 28.

The Court finds that plaintiff may move forward with her discrimination claim with respect to the first alleged adverse action – the removal from the Victor 2 position. But as to the other four actions, plaintiff has failed to come forward with any evidence of pretext or causation.

### a. Removal from the Victor 2 position

On January 15, 2016, Major Hayes informed plaintiff that she was no longer going to serve in the Victor 2 position. Hayes Aff. ¶ 14; Hayes's Note at SGI 000163; Hayes Dep. at 58:8–61:21. Defendant argues that removal from the Victor 2 position was not an adverse employment action, because this position was essentially a "glorified roving position" that was not an actual job

category.[5]  *See* Def.'s Mem. at 25–26; Def.'s Reply in Supp. of its Mot. to Dismiss [Dkt. # 26] ("Def.'s Reply") at 19–20.  Plaintiff asserts that the Victor 2 position was a "Lead Officer" position that included supervisory responsibilities.  Pl.'s Opp. at 1.

A "reassignment with significantly different responsibilities, or . . . a significant change in benefits" generally indicates an adverse action.  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  The parties agree that the Victor 2 position did not come with an increase in salary or benefits.  So, the question is whether it came with significantly different responsibilities.

The D.C. Circuit has found that withdrawing "an employee's supervisory duties constitutes an adverse employment action."  *Stewart v. Ashcroft*, 352 F.3d 422, 427 (D.C. Cir. 2003).  But in *Forkkio v. Powell*, the D.C. Circuit found that where the employee went from unit chief to section chief, and where his pay and benefits stayed the same but he no longer attended management meetings or received management-related e-mails, this was not "sufficiently significant to amount to materially adverse consequences" and that no facts indicated that "he played any substantial role in managing the Division . . . above and beyond his activities in supervising the people in his section, an aspect of employment that did not change."  306 F.3d 1127, 1131 (D.C. Cir. 2002).

There is conflicting evidence as to what the Victor 2 position entailed.  Plaintiff testified that she would be "a fill in supervisor," Thomas Dep. at 83:3–8, and that she would assist the supervisor with such tasks as "arming the officers, unarming, things of that nature."  *Id.* at 84:19–22.  Plaintiff testified that when she performed that role, she would record time and attendance for other officers, and she would figure out who was going to work what shifts.  *Id.* at 87:18–88:17.

---

5      Defendant states multiple times that the Victor 2 was not a position in the Securiguard contract.  Plaintiff agrees that this is the case.  The Court finds that this is not relevant – the parties agree that notwithstanding it not being a contractual term, it was a position that Securiguard continued to use, and when plaintiff was removed from the position, there were still others who continued to perform in that position.

SGI's Lieutenant Lee-Anthony testified that the Victor 2s were not supervisors, but that they would "just assist[] the daily operations." Lee-Anthony Dep. at 29:10–12. She stated that the Victor 2s did not have any duties that were above and beyond what a typical officer would have – rather, they would assist where needed. *Id.* at 29:13–20. Further, Lee-Anthony testified that all officers, at some time or another, served in the Victor 2 role. *Id*. at 30:16–31:5. She stated that occupying the position is not considered a prerequisite to advance up the ladder at Securiguard. *Id.* at 31:14–21.

SGI's Major Hayes referred to the position as the "lead officer position" and she suggested that the duties could be seen as part of a transition to supervisory status, even if there was no change in pay. Hayes Dep. at 14:8–11. She wrote in her affidavit that her understanding of the position was that it was meant to

> mentor special police officers whom they believed had the potential to one day become 'Victor 1' supervisors. They were used as assistants to the Victor 1 supervisors. Victor 2 special police officers had many of the duties that rank-and-file special police officers had, but were often not required to stand post; would assist with guard mounting (arming and disarming special police officers as they come on or go off duty); could fill in for a Victor 1 officer who wanted to take a national holiday off; and could prepare incident reports. Victor 2 special police officers did not have any supervisory authority, and do not conduct any personnel investigations. A Victor 2 special police officer received the same compensation as a rank and file special police officer.

Hayes Aff. ¶ 10.

Howard-Watts from Human Resources testified for SGI that the Victor 2 position was "essentially a glorified roving position" in which "[t]hey didn't have any authority to [discipline]" but "could help with administrative support to the supervisor." Howard-Watts Dep. at 89:3–90:8. However, her account included some information that was consistent with plaintiff's description. She stated that the "Victor 2" was

actually a roving position at the contract site. And the rovers are responsible for going around the building to ensure safety and security measures, there's no problems with doors, trip hazards, things of that nature. They're required to do, hit certain check points and they patrol on a scheduled business. The victor 2 was created by the predecessor company in which the rover would be in what they would consider a training, mentoring, supervisory status.

*Id.* at 89:3–13. She testified that the Victor 2s "didn't stand in place of a supervisor," but that they were "trained as supervisors so that [if] the victor 1, which was that of a supervisor position, went on vacation, called out sick . . . that person could be identified to hold a supervisory position temporarily for the day, the week, [or a] couple of days." *Id.* at 89:3–90:8.

Finally, SGI's Operations Manager Perry Shumake testified that:

[T]hey were like supervisor helpers or supervisor trainees, to a degree. They would work in a position to help the supervisor out when it came to the responsibilities of the supervisor. . . . They would help with the arming and disarming of the individuals, other supervisory responsibilities. This is usually the guard mount, where the supervisor is busiest, signing people in and signing people out, they have to supervise all of that with everything else that they have going on. So the Victors were the people that were set aside that supposedly were more responsible that you could trust to do that. And the idea was if a supervisor had to leave or step out, you had someone that was actually in training that understood what the supervisor was doing that could step in.

Shumake Dep. at 69:9–70:19.

Thus, there is a dispute of fact as to whether the position conferred supervisory responsibilities that went above and beyond a typical Special Police Officer's duties, and whether those responsibilities were taken away once plaintiff was removed from the Victor 2 position. Therefore, the question of whether the change in status is adverse is one for the jury.

The next question is whether defendant has come forward with a legitimate, non-discriminatory reason for the employment action. Major Hayes has averred that she removed plaintiff from the Victor 2 position for several reasons:

- The Victor 2 position now required working on Friday between 2 PM and 10 PM, and Thomas did not want to work those hours.

- Thomas had told her that she did not "get along" and had "a history" with Glover.

- Glover and Lieutenant Lee-Anthony had reported that Thomas had a sarcastic demeanor on one occasion.

- Major Hayes felt that if Thomas did not respect the COR, removing her from the position would reduce her interactions with him.

- Major Hayes was concerned that Thomas could not be depended on to respect confidentiality, based upon an incident where she caught Thomas reading a confidential document.

Hayes Aff. ¶ 14. Defendant has submitted a handwritten note by Major Hayes that appears to be from February 11, 2016, (the date of the second meeting about the position), stating that she had told plaintiff she was removing her for these reasons. *See* Hayes's Note. The note adds: "I advised Officer Thomas that respect for the government officials as well as the Securiguard Supervisors were [sic] mandatory and that if she could not display maturity and professionalism then I was not comfortable with her being in the position." *Id.* at SGI 000163.

Plaintiff argues that these reasons could be found to be mere pretext for discrimination because Glover had input into the decision, and he harbored discriminatory animus against her. While Major Hayes testified that Glover had no input into her decision, her list of reasons include the statements made by Glover and plaintiff about each other, and a concern that plaintiff could be disrespectful based at least in part on information provided by Glover. Thus, plaintiff submits that Glover's bias infected Hayes's decision.

"Under a cat's-paw theory of discrimination, an employer may be held liable for discriminatory acts by a direct supervisor – even where that supervisor is not the final decisionmaker – if '[1] [the] supervisor performs an act motivated by [discriminatory] animus [2]

that is *intended* by the supervisor to cause an adverse employment action, and . . . [3] that act is a proximate cause of the ultimate employment action.'" *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016), quoting S*taub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011).

A reasonable jury could find that Glover harbored discriminatory animus. A reasonable jury could also find that Glover told Hayes that plaintiff had not acted professionally around him to prompt Major Hayes to take some sort of action against plaintiff. Finally, Major Hayes specifically testified that her decision was based, at least in part, on what Glover said.

Thus, a reasonable jury could find that Major Hayes's decision to remove plaintiff from the Victor 2 position was motivated by Glover's discriminatory animus. Defendant's motion for summary judgment will be denied as to this claim.

### b. Removal from the Marshall Building

Plaintiff alleges that defendant discriminated against her when she was told that refusing the proposed transfer to the Library of Congress would be considered an automatic resignation, and she was thereby "removed" from the building. *See* Pl.'s Opp. at 32–33; 6/30/16 Howard-Watts Email. Defendant proffers its non-discriminatory reason: it did not return plaintiff to the Marshall Building because she felt unsafe in that workplace, and she felt "provoked" by Glover. Def.'s Mem. at 17, 29; 6/16/16 Email from Howard to Howard-Watts, Ex. 14 to Pl.'s Opp. [Dkt. # 24-14]. Given that information, combined with the fact that plaintiff was an armed security officer and SGI could not remove or control Glover, the HR Director, Howard-Watts, was concerned that a confrontation could occur. Howard-Watts Dep. at 115:9–16:8 (explaining that SGI did not simply put plaintiff back in the Marshall building because it felt it was in plaintiff's

best interest to transfer, and SGI was concerned that a confrontation might occur). Howard-Watts testified:

> Any time you're in an armed contract situation you can never underestimate a person's state of mind when they say they are uncomfortable or feeling provoked as to what their intent is. And so we just wanted to make sure that everybody was clear that we felt that she was stable, she was feeling comfortable, and that she didn't think there was going to be any issues going forward. . . . As an armed officer we have to take every protective measure. I don't know if she felt like if he came and harassed her further that she would do anything. But I didn't want to take that chance.

*Id.* at 149:22–51:8. Because the company "couldn't prove that there was harassment one way or the other because [Glover] den[ied] it" Howard-Watts testified that she "didn't want [Thomas] in a bad situation." *Id.* at 122:8–15; *see* Shumake Dep. at 116:20–17:9 ("I can't investigate Mr. Glover any deeper than they allowed me to. I definitely can't terminate him. But what I can do is I can protect my officer, and the way to protect my officer is to move them out of there."). The CEO of SGI, Patricia Marvil, corroborated Howard-Watts's proffered reason:

> [I asked] [h]ow serious is this and [Howard-Watts] said I think it's – she's really feeling this pretty seriously and I'm going then we can't arm her. How can we arm a person with a gun that's feeling provoked? That's irresponsible as a weapons dealer and a weapons license holder so we had a sense on that and then she asked me if I offered her a transfer may I pay for it, for the training and that's when I said sure so there she requested money approval and I approved it.

Dep. of Patricia Marvil [Dkt. # 24-13] ("Marvil Dep.") at 72:12–21. Marvil further stated that the fact that plaintiff was armed was "central" to her decisionmaking. *Id.* at 75:9. She noted that since Securiguard could not control the fate of the government employee at issue, at least it could transfer its own employee for everyone's protection. *Id.* at 75:12–16. She emphasized that the company took complaints by their armed officers seriously, because it had "to be sure that that [each] individual is mentally fit and mentally capable of carrying that weapon and ensuring that that weapon is never going to be mishandled." *Id.* at 76:9–14.

But plaintiff refused the transfer. So, Howard-Watts testified, she had to make an employment decision regarding plaintiff, and since plaintiff could not go back to the Marshall Building, she considered the refusal to be a resignation. Howard-Watts Dep. at 137:10–18.

Plaintiff maintains that she has come forward with evidence to show that defendant's stated reasoning in this instance is also pretextual. A plaintiff can demonstrate that the employer's explanation for her removal was pretextual by providing evidence from which a reasonable jury could find that the employer's proffered, lawful reasons for acting are "unworthy of credence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000), quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Showing pretext, though, "requires more than simply criticizing the employer's decisionmaking process." *Hairston v. Vance–Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014). It is not sufficient to "show that a reason given for a job action [was] not just, or fair, or sensible;" nor is it sufficient to challenge "the 'correctness or desirability' of [the] reasons offered." *Fischbach v. D.C. Dep't of Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996), quoting *Pignato v. Am. Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994).

Plaintiff offers three reasons why the proffered explanation should be rejected. First, she argues that defendant failed to follow its own procedures in requiring a transfer. Pl.'s Opp. at 32, citing *Walker v. England*, 590 F. Supp. 2d 113, 142 (D.D.C. 2008) ("The failure to follow an employer's established procedures, particularly those designed to ensure fairness in a selection process, maybe evidence of pretext."); *Lathram v. Snow*, 336 F.3d 1085, 1093–94 (D.C. Cir. 2003). Second, she argues that defendant undermined any corrective action that the AOUSC may have taken in connection with Glover when it told the agency that plaintiff's complaint was an "internal matter." Third, plaintiff points out that the email Howard-Watts later sent to union president Brian Howard states that there was "a new development in the Thomas case that may lead to

reinstatement." 7/22/16 Email from Howard-Watts to Howard, Ex. 22 to Pl.'s Opp. [Dkt. # 24-22] ("7/22/16 Email"). Since the email coincided with Major Hayes's departure, plaintiff posits that it is evidence that HR actually made the decision to remove plaintiff because Major Hayes, plaintiff's supervisor, wanted her gone, and not because SGI was concerned about plaintiff's safety.

Plaintiff's first argument does not fare well. In support of her argument that SGI varied from its policy when it required her to transfer, she cited Howard-Watts's deposition, which states:

> Q. Okay. And what if the accusation or allegation of a hostile work environment is against a third party, for example someone that actually works for the government?
>
> A. Yeah. So that's a little bit more difficult because we cannot control the government or any third party personnel. We report to their supervisor. We also put them on notice and then if the employee, if our employee is not comfortable working in that situation then we try to remove them from the situation, which is what we did in the case of Ms. Thomas.
>
> Q. And in that case the employee has the option of either staying or going?
>
> A. Yeah. There were some circumstances there in which she kept saying that she was unsafe, so we thought it would be in her best interest to move her to another site that was similar in scope and close by so it was not much impact to her work situation and her life until we can get a handle on what was going on at the government level.

Howard-Watts Dep. at 40:6–41:5. But, Howard-Watts also testified that "[t]here are no hard and fast rules" regarding when SGI requires a transfer or offers employees a choice to transfer. *Id.* at 79:1–10. Her testimony hardly shows that it was official policy to offer a choice between transferring or staying. At most, the testimony indicates that the way SGI handles complaints depends on the circumstances.

Plaintiff also points to the testimony of Operations Manager Perry Shumake, in which he stated that he "recommended that [SGI] offer her a move" rather than require her to transfer.

Shumake Dep. at 119:16–19.  Again, this is not evidence of a company policy.  Therefore, the evidence does not show that SGI contravened its official policy when it removed plaintiff, and this is not an available means to demonstrate pretext.

Second, plaintiff has asserted that SGI took steps to undermine any corrective actions the AOUSC could have taken to ameliorate the situation with Glover, and she argues that this demonstrates the company's discriminatory intent.  But plaintiff has also supplied a non-discriminatory interpretation of events, asserting that the reason SGI allegedly undermined ameliorative action by the AOUSC was that it "was interested in avoiding conflict with the AOUSC so that SGI would have the contract renewed in the future."  Pl.'s Opp. at 34.  Thus, even according to plaintiff, the fact that SGI avoided stepping on its customer's toes, without more, does not suggest that requiring a transfer to a position of equal pay and responsibility in a nearby building was actually animated by SGI's own discriminatory intent.

Finally, plaintiff points out that her reinstatement coincided with Major Hayes's departure. To her, this suggests that her supervisor had some input in her removal, and an email sent by Howard-Watts supports this theory.  The email, from Howard-Watts to union president Brian Howard, stated: "I have a new development in the Thomas case that may lead to reinstatement. Do you have an issue if I reach out to her[?]"  7/22/16 Email.  Plaintiff posits that the "new development" was the departure of Major Hayes, who had testified that she put in her 2-week notice around the end of July 2016.  Hayes Dep. at 22–24.  Howard also averred that he learned about Hayes's departure around July 22, 2016, which was the date of the Howard-Watts email. Howard Decl. ¶¶ 6–7.

Howard-Watts testified that she could not remember what she was referring to in the email when she referenced a "new development," although she testified multiple times that neither Hayes

nor Glover had any input in her decision to remove plaintiff from the Marshall Building. *See* Howard-Watts Dep. at 41:21–42:8, 116:15–17:8. But, the timing of Hayes's departure and plaintiff's reinstatement does support the inference that Major Hayes may have had a hand in plaintiff's removal from the Marshall Building in the first place.

But, even if she did, at this stage of the proceeding, the question the Court must consider is whether, based on an examination of the entire record, including the evidence relied upon to establish the *prima facie* case, the plaintiff has adduced sufficient evidence to enable a reasonable jury to conclude that the employer's legitimate rationale was not the actual reason, "and that the employer intentionally discriminated against the employee." *Brady*, 520 F.3d at 494.

Plaintiff has not come forward with any evidence that Howard-Watts acted out of bias, or that Hayes – if she weighed in at all – harbored discriminatory animus toward her. Plaintiff argues that Hayes's discriminatory animus can be inferred since she allegedly misrepresented facts surrounding her decision to remove plaintiff from the Victor 2 position when she stated that Glover did not influence her decision and when she stated that she did not know that plaintiff was gay. Pl.'s Opp. at 31–32, citing Hayes Dep. at 38:1–3 (stating she had no idea plaintiff was gay when she worked at Securiguard); *id.* at 11:6–12:18 (testifying that she reviewed the EEOC complaint in which "it talked about her being treated unfairly by Mr. Glover, John Glover, regarding her sexuality"). But disputing a witness's credibility does not demonstrate that the person had an intent to discriminate when she took employment actions. Inconsistencies in testimony have been found to bolster evidence of pretext where other evidence of pretext is supplied. *See Evans v. Sebelius*, 716 F.3d 617, 621 (D.C. Cir. 2013). But here, this is the *only* evidence of pretext that plaintiff proffers, and the Court finds that no reasonable juror could find that Major Hayes harbored

discriminatory animus that infected Howard-Watts's decision – approved by Marvil – to transfer plaintiff.  *See* Marvil Dep. at 72:6–21.

Thus, plaintiff's discrimination claim based on the purported transfer and her removal from the building when she turned it down cannot move forward on this basis.

### c.  Placement on Unpaid Leave

Plaintiff claims that after June 22, 2016, when she refused the transfer and was removed from the Marshall Building, she was placed on unpaid leave.  Pl.'s Opp. at 34.  Defendant has not supplied a legitimate, non-discriminatory reason for this action.  Therefore, the Court must then analyze if plaintiff has made out a *prima facie* case of discrimination for the jury to decide.  To do so, plaintiff must show that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Czekalski*, 475 F.3d at 364.

Plaintiff is a woman, and she asserts that she was placed on unpaid leave, which qualifies as an adverse employment action.  See *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (an adverse employment action under Title VII is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits"); *Burlington Indus.*, 524 U.S. at 762 ("A tangible employment action in most cases inflicts *direct* economic harm.").

Defendant maintains that the change was not adverse because it placed her on paid leave, not unpaid leave.  Def.'s Mem. at 26–27.  It points to the declaration of Howard-Watts, in which she avers that plaintiff was placed "on paid leave status while we investigated the complaint." Howard-Watts Decl. ¶ 3.  Plaintiff disputes defendant's account, and she points to an email from Howard-Watts to payroll, stating:  "Please pay Kalisha Thomas admin pay for dates of June 13 –

22, 2016." 6/28/16 Email from Howard-Watts to SGI Payroll, Ex. 41 to Pl.'s Opp. [Dkt. # 24-41].

Additionally, Howard-Watts stated in an email that plaintiff's "last day of employment" would be

June 22, 2016, 6/28/16 Email from Howard-Watts to Howard, Ex. 18 to Pl.'s Opp. [Dkt. # 24-18],

and another email from Howard-Watts states that "[s]he has been off schedule since June 3, 2016,

with little admin pay." 8/23/16 Email from Howard-Watts to Hayes, Ex. 38 to Pl.'s Opp. [Dkt.

# 24-38]. Thus, there is a dispute of fact as to whether plaintiff was placed on unpaid status, and

therefore suffered an adverse employment action.

However, plaintiff has failed to point to any evidence that the unfavorable action gives rise

to an inference of discrimination. Even if she was placed on unpaid leave, there is no evidence on

the record that Howard-Watts harbored discriminatory animus towards plaintiff, nor is there any

evidence that Major Hayes harbored discriminatory animus that may have infected Howard-

Watts's decision. Furthermore, there is no indication that either Hayes or Glover had any input

into the decision to place plaintiff on leave – it is part and parcel of the same action discussed

above: the removal from the building in the wake of plaintiff's rejection of the transfer. Thus,

plaintiff has failed to establish a *prima facie* case of discrimination for this action, and plaintiff

may not move forward with her discrimination claim on the basis of the placement on unpaid leave.

### d. Negative Suitability Determination

In August 2015, plaintiff was reinstated to resume her job at the Marshall Building. To

officially return to her position, she was required to undergo a "suitability determination."[6]

---

6    When she agreed to return and signed the settlement agreement, she argues that no one informed her that the suitability check would be a requirement, even though SGI apparently found out from the AOUSC that its officers would be required to undergo the determination on June 3, 2016. Pl.'s SF ¶ 47. It's unclear why this is relevant. Plaintiff uses this fact to bolster her argument that SGI played a "deleterious role in the process," Pl.'s Opp. at 35, but she does not submit how this fact has any bearing on her discrimination claim.

Plaintiff was aware that all officers were required by the AOUSC, not SGI, to undergo a suitability determination, and that other officers at the Marshall Building did in fact undergo the evaluation that year. Thomas Dep. at 179:15–180:2; *see* Howard-Watts Dep. at 133:18–34:6. It is also agreed that Glover did not conduct the evaluation – his role was merely to schedule it. Def.'s SUMF ¶¶ 94–95, 97.

Plaintiff does not argue that the fact that she was required to undergo a suitability determination was an adverse action, nor does she contest that Securiguard had no part in administering the evaluation or imposing it as a requirement. Instead, she argues that SGI did not provide adequate information to the evaluator at the AOUSC, and that had SGI provided the information, she would not have received a negative determination. Pl.'s Opp. at 35–36.

Part of the suitability determination involved plaintiff's completion of a form that included questions regarding her work history. Howard Watts Decl. at SGI 000258–59. On the form, plaintiff answered two questions "yes": whether she had ever been fired or separated from a job and whether she had any delinquent federal debt. *Id.* In a space that provided her an opportunity to add additional information, plaintiff wrote that she was removed from the Marshall Building because she "refused to be transferred to another site by Securiguard Inc." *Id.* In her words, "Securiguard did an automatic resignation." *Id.*

The AOUSC faxed Securiguard an Employment Verification form to fill out, asking for "clarifying comments" regarding plaintiff's separation from SGI.[7] SGI filled out one portion of the form: that plaintiff was employed from "11/01/2015" to "On leave 6/13/2016." Howard-Watts

---

[7] Sometimes, the evaluator may want more information, so she will contact an employee's employer to fill out a supplemental form. In plaintiff's case, Carla Harris, the evaluator, testified that her intern would usually reach out to the employer before Harris has looked at the file, so that when Harris could turn to it, she could see a full record. *Id.* at 167:21–68:16.

Decl. at SGI 000256–57. The rest of the form was rubber stamped: "COMPANY POLICY PRECLUDES PROVIDING ANY INFORMATION OTHER THAN DATES OF EMPLOYMENT AND POSITIONS HELD." *Id.* Howard-Watts testified that she did not fill out the form, but she thought that a member of her staff did. Howard-Watts Dep. at 159:7–20.

SGI has adduced evidence showing that the reason plaintiff received the negative determination was because of plaintiff's own admissions on the form. Carla Harris, the HR employee at the AOUSC who conducted the evaluation, testified that both the federal debt issue and removal from the SGI position contributed to the negative suitability determination. Harris Dep. at 103:15–110:19. She also testified that she understood the information on plaintiff's form to mean that she had been ordered to report to another site, and she refused. Harris Dep. at 166:19–167:8; 42:22–43:9. She interpreted plaintiff's refusal as insubordination. *Id.* When asked if more information regarding the "insubordination" would have made a difference in her evaluation, Harris testified that it would not:

> Q: If – if Seciguard – after you make your suitability determination – . . . if Securiguard had told you Ms. Thomas has never been insubordinate at Securiguard, we have never had a problem with her being insubordinate or violating rules, if you had gotten that kind of communication, would you have changed your suitability determination? . . .
>
> A. No.
>
> Q. Why not?
>
> A. Because it's not uncommon for manager or supervisors or employers to provide information that's not consistent with a suitability evaluation. So there may be instances where one supervisor may think the same conduct is or isn't acceptable or one performance standard or – is okay with one and it's not okay with another. As a suitability professional, my job is to determine for our agency what is the conduct, what is the nexus, and what type of position are they going into and would this be acceptable conduct for our agency. . . .

Q. If you had received that communication from Securiguard, Kalisha Thomas has never been insubordinate, never violated the rules, she's a good employee, would that have led you to ask for details about what Ms. Thomas wrote on the form to find out if her refusal to accept that assignment did have indication of insubordination or a rule violation.

A. It's difficult to say.

Q. It could have?

A. Probably not.

Q. Well, probably not is . . . not no; right?

A. No, it's not no. I don't know.

Harris Dep. at 76:2–78:1.

Q. We placed Miss Thomas on leave of absence when she was removed from RMFJB and her status remains the same. . . . Given your testimony, would that fact have made a difference in her suitability determination? . . .

A. No. . . . Because lots of times employees may be AWOL and have just never been removed or an employee could have failed a drug test. And the process of a – of a separation is a lengthy process, but suitability of a security officer isn't bound to not take action because an HR function hadn't been there. There are lots of employees who may have been removed or may have not been removed, but the primary consideration is what's the conduct at hand. Because once a person is an employee, you don't want to have to remove them after something happens, you want to preemptively not employ someone who has demonstrated conduct that's not consistent with what you want as an agency.

*Id.* at 172:8–73:19.

Plaintiff is suggesting now that information from her employer concerning an absence of insubordination could have swayed the suitability decision. But the form does not ask about insubordination; it asks why the employee was separated. And had it been filled out completely, it would have said exactly what plaintiff said and what Harris understood – that plaintiff refused a

transfer – even if it then more clearly explained that she was placed on leave as a result and not fired.

In sum, while the AOUSC's determination does appear to be harsh in light of all the circumstances, that does not mean the plaintiff has shown that *SGI* did something adverse. Her suggestion that more information from SGI would have changed her suitability determination is pure speculation that has no support in the record. Plaintiff has come forward with no evidence that SGI could have done anything to change the outcome.

Also, even if plaintiff's consternation about the entire process is justified, she has not come forward with any evidence that helpful information was omitted from the form as a result of any discriminatory animus. Howard-Watts did not fill out this form – someone in her office did – and there is no reason to believe people in Howard-Watts's office harbored discriminatory animus against plaintiff. Thus, the suitability determination cannot be a basis for plaintiff's discrimination claim.

### e. Termination

Plaintiff asserts that her ultimate termination was an adverse action, and defendant maintains that plaintiff was terminated on non-discriminatory grounds given the suitability determination. Plaintiff argues that SGI has proffered inconsistent reasons for her termination, and that suggests the reasons are pretextual. Pl.'s Opp. at 36–37. She notes that SGI stated at one point that after the suitability evaluation, it renewed its offer to transfer her to the Library of Congress. Howard-Watts Dep. at 164:10–20, 166:17–67:11. Howard-Watts testified that plaintiff never responded to that offer, *id*. at 167:7–11; *see* SGI Responses to Interrogatories, Ex. 8 to Pl.'s Opp. [Dkt. # 24-8] at # 11, but plaintiff testified that she never received the offer. Thomas Dep. at 223:17–224:5. SGI has also stated that it terminated plaintiff's employment because she

received a negative determination. Thomas Termination Notice, Ex. 2 to Pl.'s Opp. [Dkt. # 24-2] ("Termination Notice"). Plaintiff argues that these shifting reasons provide the necessary evidence of pretext. Pl.'s Opp. at 36–37.

It is true that "vague and shifting testimony" could allow a reasonable jury to infer that the company's explanations were pretextual and intended to shield an illicit motive. *See Evans*, 716 F.3d at 618–19; *Merchandising Corp. v. NLRB*, 53 F.3d 1334, 1344 (D.C. Cir. 1995); *Walker*, 590 F. Supp. 2d at 141. But at the end of the day, the plaintiffs in these cases all supplied the court with evidence of pretext in addition to the "vague and shifting" rationales. *Evans*, 716 F.3d at 621; *Merchandising Corp.*, 53 F. 3d at 1344; *Walker*, 590 F. Supp. 2d at 141.

Here, the first problem is that the two explanations are not even particularly inconsistent – both are grounded in the suitability determination issued by the AOUSC. And plaintiff has little else to point to to suggest that after she turned down the transfer to the Library of Congress, and the AOUSC would not let her return, SGI let her go for some other discriminatory reason. While there may be a dispute of fact about whether she was offered some other transfer, that dispute is not material.

Defendant, on the other hand, has come forward with evidence that the termination was premised on the negative determination. First, plaintiff's termination letter states that her termination was based upon the negative evaluation. Howard-Watts Decl. at SGI 000612. Second, the record contains testimony that SGI terminated others who were found unsuitable, including at least six other incumbent officers at the Marshall Building. Howard-Watts Dep. at 153:4–17; *see* Marvil Dep. at 131:19–132:6 (stating that "quite a few incumbents lost their jobs" due to the suitability determination). And, a number of new hires also had their offers rescinded. Howard-Watts Decl. ¶ 7. Third, Howard-Watts also averred that she was not aware of *any* Securiguard

employee who was permitted to remain employed after receiving an unfavorable suitability determination. *Id.* ¶ 8.

The Court looks at the evidence as a whole. *See Lathram*, 336 F.3d at 1088 ("[T]o survive summary judgment the plaintiff must show that a reasonable jury could conclude from *all of the evidence* that the adverse employment decision was made for a discriminatory reason." (emphasis added)). While the negative determination fairly rankles, and the termination that follows does as well, plaintiff has not come forward with evidence that could persuade a reasonable fact finder that the proffered reason was merely a pretext. Therefore, defendant is entitled to summary judgment on that portion of the discrimination claim based on plaintiff's termination.

## IV.    Retaliation

In Count II, plaintiff alleges that SGI retaliated against her when it removed her from the Victor 2 position, instructed her not to return to her post at the Marshall Building, placed her on

unpaid leave, subjected her to a suitability evaluation, and terminated her. *See* Pl.'s Opp. at 41; Compl. ¶ 43.[8]

A *prima facie* case of retaliation requires a showing (1) that plaintiff engaged in statutorily protected activity; (2) that she suffered a materially adverse action at the hands of her employer; and (3) that a causal link connects the two. *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010); *Hamilton*, 666 F.3d at 1357. "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . . This requires proof that unlawful retaliation would not have occurred in the absence of the alleged wrongful actions of the employer." *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

The *McDonnell Douglas* burden-shifting framework applies to Title VII retaliation claims as well. *Holcomb v. Powell*, 433 F.3d 889, 901 (D.C. Cir. 2006). Thus, where an employer has offered a legitimate, non-retaliatory reason for its action, the inquiry focuses on whether plaintiff has come forward with evidence showing that the proffered reason is not the actual reason, and

---

8    In her complaint, plaintiff does not include the removal from the Victor 2 position as an adverse action for her retaliation claim, and she includes the failure to complete the paperwork to transfer her license as an adverse action. Compl. ¶¶ 43–44. But, in her opposition brief, she includes the demotion as part of her retaliation claim and argues that the failure to transfer plaintiff's license was evidence of pretext – not a separate adverse action. Pl.'s Opp. at 41. Since defendant has not objected to the inclusion of the demotion in plaintiff's retaliation claim, and since plaintiff is permitted to change the legal theories she relies on after filing a complaint, "as long as that theory is supported by the facts alleged and as long as the defendant is not prejudiced on the merits," *Hanson v. Hoffmann*, 628 F.2d 42, 53 n.11 (D.C. Cir. 1980), the Court will analyze the demotion as an adverse action with respect to the retaliation claim. The Court will also treat the failure to transfer paperwork, though, as a circumstance potentially bearing on pretext, not a separate adverse action. But even if plaintiff intended to include that event as an adverse action, her retaliation claim could not proceed on that basis because plaintiff has not submitted any evidence showing that there was a causal link between her EEOC complaint in February of 2016 and the failure to transfer paperwork which occurred between April and May of 2017. *See* Thomas Dep. at 147:12–149:14.

that the actual reason was retaliation. *See, e.g.*, *Rochon v. Lynch*, 139 F. Supp. 3d 394, 403 (D.D.C. 2015) (applying *McDonnel Douglas* and *Brady* in the retaliation context).

Plaintiff argues that the same five adverse actions that formed the basis of her discrimination claim also form the basis for her retaliation claim. The Court finds that defendant is not entitled to summary judgment on the grounds that the removal from the Victor 2 position and her placement on unpaid leave are not adverse.[9] But the other adverse actions cannot serve as a basis for plaintiff's retaliation claim.

### a. Removal from the Victor 2 position

The standard for what constitutes an adverse action for purposes of a retaliation claim is not the same as the test applied in discrimination claims; adverse actions under this prong of Title VII are "'not limited to discriminatory actions that affect the terms and conditions of employment,'" but the category extends to any harm that "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Baird v. Gotbaum*, 662 F.3d 1246, 1249 (D.C. Cir. 2011), quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 64, 68. "In other words, the proscription against retaliation sweeps more broadly than the proscription against gender discrimination." *Gaujacq*, 601 F.3d at 577.

But the concept is not unlimited, and a retaliation plaintiff must still prove more than trivial harms: "[a]ctionable retaliation claims are limited to those where an employer causes 'material

---

9       Defendant unconvincingly argues that plaintiff did not engage in any protected activity, because no reasonable person would have thought that the conduct she was complaining about violated Title VII or the DCHRA. Def.'s Mem. at 23. The D.C. Circuit has held that the plaintiff must have had a reasonable belief that the conduct created an actionable hostile work environment. *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 24 (D.C. Cir. 2013). There is no evidence on the record indicating that plaintiff thought her environment was not actionable. Indeed, she eventually filed an EEOC complaint, which is undoubtedly protected activity, and indicates her frame of mind regarding whether she thought the environment was hostile.

adversity,'" and the plaintiff still must suffer some objectively tangible harm. *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007) (emphasis omitted), quoting *Burlington N.*, 548 U.S. at 68; *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006), quoting *Forkkio*, 306 F.3d at 1130–31. It is an objective standard that is phrased "in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69.

As stated above, there is a dispute of fact over whether the Victor 2 position was a desired position that came with supervisory responsibilities. Thus, a reasonable jury could find that removal from this position is more than a trivial harm, and it could dissuade a reasonable worker from making a charge of discrimination.

Defendant argues that the Victor 2 issue cannot form the basis of a retaliation claim anyway, because she reported Glover's conduct only after she was removed from the position. Def.'s Mem. at 26.

But, plaintiff testified that she told Major Hayes about Glover's conduct before she was removed from the position. Thomas Dep. at 274:5–11. And, there is a dispute of fact over when she reported the conduct to her immediate supervisors, and when those supervisors then told Major Hayes. *See id.* at 61:4–63:16; Lee-Anthony Dep. at 41:8–13; Hayes Dep. at 18:10–19:13. Additionally, Hayes indicates that one of the reasons she removed plaintiff was because she did not get along with the COR, Glover. Hayes Aff. ¶ 14. Thus, a reasonable jury could conclude that plaintiff was removed from the position because she complained about Glover's conduct.

### b. Removal from the Marshall Building

SGI's stated reason for plaintiff's removal from the Marshall Building was its concern about a potential confrontation. Plaintiff has not come forward with any evidence that the reason

offered was not the real reason. Thus, plaintiff's retaliation claim cannot move forward on this basis.

### c. Unpaid Leave Status

Defendant does not supply any reason why plaintiff was placed on unpaid leave, rather than paid leave, if that was indeed what happened. The Court must then analyze whether plaintiff has established a *prima facie* case or retaliation, which involves (1) whether she engaged in protected activity; (2) whether she suffered a materially adverse action by her employer; and (3) that a causal link connects the two. *Gaujacq*, 601 F.3d at 577; *Hamilton*, 666 F.3d at 1357.

First, plaintiff engaged in protected activity when she filed an EEOC complaint in February 2016, and she complained again to her union in June 2016. Second, as explained above, a dispute of fact exists as to whether she suffered a materially adverse action, since plaintiff contends that she was placed on unpaid leave, and defendant maintains that it paid her.

Third, "for purposes of establishing a *prima facie* case of retaliation, '[t]emporal proximity can indeed support an inference of causation, but only where the two events are very close in time.'" *Hamilton*, 666 F.3d at 1357, quoting *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007). "[T]his circuit has held that a close temporal relationship may alone establish the required causal connection." *Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003). Her complaint against Glover was resubmitted by the union president on June 3, 2016, and plaintiff was allegedly placed on unpaid status on June 22, 2016. Thus, a reasonable jury could find that plaintiff was placed on unpaid leave because she engaged in protected activity. The Court will not grant defendant's motion on this ground.

#### d. Negative Suitability Determination

As stated above, the evidence on the record indicates that plaintiff's negative determination was caused solely by her own statements on the questionnaire. Plaintiff has pointed to no evidence showing that SGI's "interference" caused the negative result. Nor has plaintiff pointed to any evidence suggesting that SGI did not fill out the form completely because she filed the EEOC complaint in February 2016. Thus, this action cannot serve as a basis for plaintiff's retaliation claim.

#### e. Termination

Finally, plaintiff was terminated because she failed her suitability determination. Plaintiff argues that the jury could conclude that retaliation was the real reason for her termination because SGI's later failure to transfer her license to her new employer demonstrates its retaliatory animus. Pl.'s Opp. at 41. But plaintiff provides no additional information about the paperwork transfer, such as who at SGI was charged with license transfers, and who was responsible for the company's failure to do it, and whether those individuals were aware of plaintiff's protected activity. Furthermore, plaintiff requested the transfer of paperwork in April 2017, more than a year after she complained about Glover's conduct, and before she filed this action. Thus, plaintiff has failed to come forward with any evidence to show that the legitimate reason offered by defendant for the termination was merely a pretext for retaliation.

### V. Hostile Work Environment

In Count III, plaintiff alleges that she was subjected to a hostile work environment in violation of the DCHRA and Title VII. Compl. ¶¶ 48–51. She alleges that it was both a discriminatory and a retaliatory hostile work environment. *Id.* ¶ 48. Defendant argues that the

conduct was not sufficiently severe or pervasive, and that even if it was, it took the actions it was required to take to address the situation. Def.'s Mem. at 12–18.

### a. A dispute of fact exists as to whether the conduct was sufficiently severe or pervasive.

Plaintiff alleges that she was subjected to a hostile work environment created by John Glover. She alleges that he would: refer to her as "sir"; make comments that equated her to a man; make comments about how masculine or mannish she was; call her a "play boy" and commented that she must have many girlfriends; and laugh and shake his head when he walked by her. Thomas Dep. at 41:18–58:17, 68:14–71:20. This would occur two to three times a week. *Id.* at 52:17–53:20. Plaintiff also alleges that the conduct increased in frequency after she filed her EEOC complaint in February 2016. *Id.* at 103:7–104:16 (stating that "[i]t was more and more, like almost every single time I would see him, he would laugh, shake his head"). The conduct escalated from two to three times a week to four to five times a week after February 2016, "as far as the laughing and shaking his head." *Id.* at 104:17–22. She also stated that she felt that Glover was following her from post to post. 6/6/16 Email from Howard to Howard-Watts, Ex. 16 to Pl.'s Opp. [Dkt. # 24-16]. Plaintiff also takes the position that her demotion from the Victor 2 position, her removal from the Marshall Building, and SGI's failure to transfer plaintiff's Armed Special Police Officer License paperwork to another employer after she was terminated, contributed to the hostile work environment. Pl.'s Opp. at 17–18.

However, the demotion, the removal, and the failure to transfer paperwork are discrete employment actions, and "this jurisdiction frowns on plaintiffs who attempt to bootstrap their alleged discrete acts of retaliation into a broader hostile work environment claim." *See Mason v. Geithner*, 811 F. Supp. 2d 128, 177 (D.D.C. 2011), quoting *Baloch v. Norton*, 517 F. Supp. 2d 345, 364 (D.D.C. 2007), *aff'd sub nom. Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008);

*Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 85 (D.D.C. 2013). This is because a hostile work environment differs from retaliation claims in that "[t]heir very nature involves repeated conduct." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). In determining whether discrete acts can be considered in a hostile work environment claim, the Court considers "the extent to which the alleged actions are related in time and type," and "if certain actions are so remote in time or different in kind that a reasonable trier of fact could not find them to be part of the same work environment, then those actions should not be considered." *Mason*, 811 F. Supp. 2d at 178, citing *Vickers v. Powell*, 493 F.3d 186, 199–200 (D.C. Cir. 2007). Because there is some evidence indicating that Glover may have been involved in the alleged demotion, a reasonable trier of fact could find that to be part of the same "environment" as the comments he would make to her. But the removal from the Marshall Building, while not remote in time, is completely different than and separate from Glover's conduct, and there is no evidence that he was involved in that decision. Furthermore, defendant's failure to transfer her license paperwork is remote in time: it took place more than a year after plaintiff complained about Glover's conduct, *see* Thomas Dep. at 147:12–149:14, and a post-termination action could hardly have contributed to the pre-termination employment environment. Also, it is completely different in kind from Glover's comments. Thus, the Court will not consider the removal or the failure to transfer her license in analyzing plaintiff's hostile work environment claim.

Plaintiff reasons that the hostile work environment claim can be analyzed, "[a]dditionally, or in the alternative," under the "discrimination rubric" or the "retaliation rubric." Pl.'s Opp. at 18–22. But plaintiff does not specify which actions contributed to the discriminatory hostile work environment and which actions contributed to the retaliatory hostile work environment. The scope of a discriminatory hostile work environment claim would exclude actions that bear no relation to

plaintiff's gender, and the retaliatory hostile work environment claim would exclude actions that bear no relation to plaintiff's protected activity. *See Whorton v. WMATA*, 924 F. Supp. 2d 334, 350 (D.D.C. 2013). Here, the only actions that occurred after plaintiff engaged in protected activity were the demotion, removal, and failure to transfer paperwork. Since the Court has already found that the removal and paperwork transfer were discrete acts that cannot be properly considered as part of the hostile work environment claim, plaintiff is left only with the demotion. This one incident does not show the "severe or pervasive conduct" that would be needed to support a retaliatory hostile work environment claim. Thus, the Court will analyze plaintiff's hostile work environment claim only under the "discrimination rubric."

To establish a *prima facie* discriminatory hostile work environment claim, a plaintiff must demonstrate that (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon sex; (4) the harassment unreasonably interfered with the plaintiff's work performance and created an intimidating, hostile, or offensive working environment; and (5) the existence of respondeat superior liability. *Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122–23 (D.C. Cir. 2002).

"[I]n order to be actionable under [Title VII], a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). In determining whether a hostile work environment exists, courts "look[] to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "[S]imple teasing, offhand comments, and isolated incidents

(unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788, citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998).

Not all abusive behavior – even if motivated by discriminatory animus – is actionable under Title VII unless the conduct "permeates the workplace with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *See e.g.*, *Barbour v. Browner*, 181 F.3d 1342, 1347 (D.C. Cir. 1999), citing *Oncale*, 523 U.S. at 77. The Supreme Court has emphasized "careful consideration of the social context in which . . . behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81. At the same time, standards judging hostility must be demanding to ensure that Title VII does not become a "general civility code." *Faragher*, 524 U.S. at 788.

The D.C. Circuit has recognized the disjunctive nature of the test – "severe or pervasive" – when considering whether one isolated but extremely severe incident could suffice to create a hostile work environment. *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 579 (D.C. Cir. 2013) (J. Kavanaugh, concurring) (underscoring standard is disjunctive and a single severe incident like use of extreme racial epithet may alone suffice to create a hostile work environment). Using the same reasoning, one could conclude that a strong showing of pervasive conduct, which may not ordinarily be considered "severe," may create a hostile work environment as well. Indeed, other circuits have found "the required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." *Nichols v. Azteca*, 256 F.3d 864, 872 (9th Cir. 2001). In applying that standard, the Ninth Circuit has held that where plaintiff was called a name that was not his name, to which he objected twice a week for a year, the jury could conclude that the environment was a hostile one. *El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1073 (9th Cir. 2005).

In the end, when considering the totality of the circumstances, the Court must decide whether the conduct "has the requisite heft to be actionable – or whether it amounts to a series of 'slights' that are 'no more a hostile work environment than a pile of feathers is a crushing weight.'" *Sierra v. Hayden*, No. 16-cv-1804, 2019 WL 3802937 at *12 (D.D.C. Aug. 13, 2019), quoting *Baird v. Gotbaum*, 792 F.3d 166, 171–72 (D.C. Cir. 2015).

Here, Glover's comments were specifically directed at plaintiff's sexuality. They cannot be characterized as mere "name-calling" or comments that are part of the "ordinary tribulations of the workplace," such as expressions of frustration, criticism, or seemingly random enforcement of workplace rules. *Brooks v. Grundmann*, 748 F.3d 1273, 1277 (D.C. Cir. 2014); *Richard v. Bell Atlantic Corp.*, 209 F. Supp. 2d 23, 35 (D.D.C. 2002) ("[R]ude comments, unjust criticism, and stressful working conditions, amount to ordinary tribulations of the workplace that [are] insufficient as a matter of law for a hostile environment case.").

Defendant argues that the conduct here is not severe, and it points to cases in this district in which courts declined to find a hostile work environment when even more severe actions were alleged, such as physical contact and sexual advances. Def.'s Mem. at 12–13, citing *Akonji v. Unity Healthcare, Inc.*, 517 F.Supp.2d 83, 97–99 (D.D.C.2007) (acts of sexual harassment by supervisor, including touching plaintiff's buttocks and thigh, trying to kiss her, calling her beautiful, and asking her to accompany him on weekend trip, "although by no means ideal workplace conduct, [were] not 'sufficiently severe or pervasive to alter the conditions of [Akonji's] employment and create an abusive working environment.'"), quoting *Harris*, 510 U.S. at 21; *Carter v. Greenspan*, 304 F.Supp.2d 13, 25 (D.D.C. 2004) ("Assuming that [plaintiff's] allegations that [co-worker] 'caressed [him] on his knee,' 'placed her breast on [his] arm,' and 'placed her fingers on [his] buttocks' are true . . . these three isolated incidents are not sufficiently severe in

quantity or quality to unreasonably interfere with plaintiff's work performance or create a hostile work environment.").

But these cases focus on the severity of the actions rather than their pervasiveness, and the isolated nature of the incidents was important to the decisions. Here, the pervasiveness of the conduct creates a genuine factual dispute for the jury as to whether plaintiff had to endure an abusive working environment. Plaintiff alleges that the conduct occurred approximately two to three times a week from November 2015 to June 2016, and from February to June 2016, it increased in frequency. While there is no precise formula or mathematical test to determine when conduct becomes "pervasive," *see Harris*, 510 U.S. at 22; *Dickerson v. SecTek, Inc.*, 238 F. Supp. 2d 66, 83 (D.D.C. 2002), a reasonable fact-finder could conclude that the conduct here was pervasive enough to permeate the workplace, unreasonably interfere with plaintiff's ability to perform her duties, and create a hostile work environment. *See Simms v. Ctr. for Corr. Health & Policy Studies*, 794 F. Supp. 2d 173, 192–93 (D.D.C. 2011) (finding a hostile work environment when a co-worker asked out plaintiff every time he saw her, harassed her daily for two years by commenting on her appearance, asking to see her body, staring at her, undressing her with his eyes, and physically accosting her at work).

### b. A dispute of fact exists as to whether SGI took prompt corrective action.

SGI argues that even if Glover created a hostile work environment, SGI cannot be held liable for the harassing behavior of a third party not in its employ, and Glover's conduct cannot be imputed to SGI. Def.'s Mem. at 14–18.

Despite defendant's contention, several circuits, including our own, have concluded that that an employer can be held liable for a non-employee's conduct. *See, e.g.*, *Martin v. Howard Univ.*, 275 Fed. App'x 2, 5–6 (D.C. Cir. 2008) (finding whether alleged harassment by a homeless

person who was neither an employee nor a student of the university was based on plaintiff's gender was a question for a jury); *E.E.O.C. v. Cromer Food Servs., Inc.*, 414 F. App'x 602, 608 (4th Cir. 2011) (finding that an employee of a food stocking company can bring a Title VII claim against his employer when he was harassed by non-employees at a hospital where he restocked vending machines, and his employer knew about the harassment); *Erickson v. Wis. Dep't of Corr.*, 469 F.3d 600, 605 (7th Cir. 2006) (employee brought claim against Department of Corrections because she was raped by a prisoner housed in the same building as the employer); *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1244 (10th Cir. 2001) (psychologist sues state mental hospital and the state under Title VII for sexual harassment when she was assaulted by a patient); *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1073–74 (10th Cir. 1998) (employer may be found liable for the harassing conduct of its customers); *Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1108 (8th Cir. 1997) (employer, a residential program for developmentally disabled individuals, can be held liable for the actions of a mentally incapacitated resident toward employees).

And, courts in this district have concluded that an employer can be held liable for a hostile work environment created a non-employee.[10]  *See Whiting v. Labat-Anderson, Inc.*, 926 F. Supp. 2d 106, 117 (D.D.C. 2013) (finding that plaintiff, employed by a consulting firm to perform on-site services for the DOJ, who claimed that a DOJ employee made two sexual advances toward

---

10      Federal regulations also provide:

An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing these cases the Commission will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees.

29 C.F.R. § 1604.11(e).

her, could bring a Title VII action against her employer); *Simms v. Ctr. for Corr. Health & Policy Studies*, 794 F. Supp. 2d 173, 191 (D.D.C. 2011) (denying summary judgment where plaintiff, employed by the Center for Correctional Health and Policy Studies ("CCHPS"), claimed that non-employees created a hostile work environment, and CCHPS did not make a formal attempt to investigate the claims).

"To prevail on a claim of a hostile work environment created by a non-employee, a plaintiff must show that the employer knew or should have known of the existence of the hostile work environment and failed to take proper remedial action." *Simms*, 794 F. Supp. 2d at 191. An employee can demonstrate that an employer failed to take proper remedial action by demonstrating that the employee complained to higher management with no relief. *Bundy v. Jackson*, 641 F.2d 934, 947 (D.C. Cir. 1981). "In determining whether an employer should be responsible for a hostile work environment caused by a non-employee, courts consider the extent of the employer's control over the harasser and any other legal responsibility which the employer may have with respect to the conduct of the non-employees." *Martin v. Howard Univ.*, No. 99-1175 TFH, 1999 WL 1295339, at *3 (D.D.C. Dec. 16, 1999), *aff'd*, 275 F. App'x 2 (D.C. Cir. 2008), citing *Otis v. Wyse*, No. 93–2349–KHV, 1994 WL 566943, at *7 (D. Kan. Aug. 24, 1994). The employer has an affirmative defense to a hostile environment claim if (1) the employer "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807; *see also Burlington Indus.*, 524 U.S. at 765; *Taylor v. Solis*, 571 F.3d 1313, 1318 (D.C. Cir. 2009).

Defendant argues that (1) plaintiff did not promptly report the alleged harassment, and (2) plaintiff failed to avail herself of SGI's offer of a corrective opportunity in the form of a transfer.

Def.'s Mem. at 15–17.  Defendant points out that plaintiff has testified that the harassment was present even before SGI took over the contract in November 2015, but she did not report the harassment until February of 2016, when she filed her EEOC complaint.  Defendant notes that it has anti-harassment policies and procedures to report harassment which were known to the plaintiff.  Def.'s Ex. C at SGI 000155; Thomas Dep. at 73:2–22.  SGI also argues that it immediately commenced an investigation when it did become aware of plaintiff's concerns.  It emphasizes that it offered plaintiff a transfer since it could not remove Glover, and that it was plaintiff who refused to accept the solution.  Thus, defendant maintains that any alleged harassment by Glover cannot be imputed to SGI.  Def.'s Mem. at 18.

While defendant's arguments have some force, the record does not clearly establish that plaintiff did not report the harassment until February 2016.  She testified that soon after she became an employee of SGI, she reported Glover's conduct to Captain Morton (the Captain in the fall of 2015); one of her supervisors, Captain David Grogan; the union president, Brian Howard; and her direct supervisor, Lieutenant Michelle Lee-Anthony.  Thomas Dep. at 45–46; *see* Lee-Anthony Dep. at 21.  Captain Grogan was only employed at SGI from November 2015 and February 2016, Shumake Dep. at 134:6, so those dates do not disprove her testimony that she spoke to him before February.  Lieutenant Lee-Anthony testified that plaintiff had complained about Glover to her, *see* Lee-Anthony Dep. at 41–43, although she also could not remember the time frame.  *Id.* at 39–40.  Major Hayes testified that Lee-Anthony had told her that plaintiff felt uncomfortable with Glover on one occasion, and Hayes informed Lee-Anthony that if plaintiff wanted to make a complaint about Glover, that she would need to put it in writing.  *See* Hayes Dep. at 18:17–19:5.  Again, no time frame is specified.  Furthermore, plaintiff testified that she complained about Glover to Major Hayes before they had their first meeting regarding the Victor 2 demotion, on January 15, 2016.

Thomas Dep. at 98:5–17, 274:5–11; Hayes Aff. ¶ 14 (meeting with Thomas occurred on Jan. 15, 2016). The fact that one of Hayes's stated reasons for demoting plaintiff from the Victor 2 position was that "she did not 'get along' and had 'a history' with the COR, Mr. Glover," Hayes. Aff. ¶ 14, corroborates plaintiff's account that she spoke to Hayes about Glover before the meeting. Thus, the Court cannot conclude as a matter of law that plaintiff failed to promptly report the harassment.

Furthermore, the record does not conclusively establish that SGI opened an official investigation when plaintiff filed the EEOC complaint in February of 2016. Howard-Watts received an email with the charge of discrimination on February 17, 2016, Howard-Watts Dep. at 74; 2/17/16 Email from EEOC to Howard-Watts, Ex. 12 to Pl.'s Opp. [Dkt. # 24-12], but she cannot remember if she investigated it, and she testified only that she thinks that she had a conversation with plaintiff about the allegations. Howard-Watts Dep. at 77:10–13. She also testified that she believed the company's legal department, would have looked into it, and that she would have spoken to Brian Howard and Perry Shumake about it. *Id.* at 75:8–13. She also averred in her declaration that she had spoken to Darrell Butler, an employee in the Fair Employment Practices Office at the AOUSC, to notify him that an SGI employee had made an allegation of harassment against a government employee, *see* Howard-Watts Decl. ¶ 4, but the declaration does not state when she took that step. Finally, she testified that she concluded there was no support for plaintiff's allegations, but her testimony leaves room for the jury to conclude there was less than a fulsome investigation.

Defendant argues that a full investigation did occur – SGI's Operations Manager Perry Shumake reviewed video footage and interviewed Glover. Howard-Watts Decl. at SGI 000264, Email from Shumake to Howard-Watts, Ex. E to Def.'s Opp. [Dkt. # 20-8] at SGI 000374. But

the record indicates that this did not take place until June of 2016, after Howard-Watts received plaintiff's complaint from the union.[11]  *Id.*

Multiple witnesses testified that SGI had no control over Glover's conduct.  Shumake Dep. at 116–17; Howard-Watts Dep. at 40; Marvil Dep. at 75.  Plaintiff takes the position, though, that SGI undermined actions that could have been taken by the AOUSC.  Howard-Watts testified that SGI's policy was to report accusations of misconduct to the supervisor of the perpetrator.  Howard Watts Dep. at 40:6–13.  But the record is not clear as to what notice was given to Glover's employer regarding the allegations against him.  In June of 2016, SGI's CEO Patricia Marvil spoke to Glover's supervisor, Scott Ellermets, stating that SGI thought the issue with plaintiff was a "company issue" and that she was going to be removed from the building.  *Id.* at 161:12–18.  And, Howard-Watts let Ellermets know that the issue was an internal matter that was being handled within SGI.  *Id.* at 162:1–4.  On July 1, 2016, Ellermets memorialized a meeting that he had with Marvil about plaintiff, indicating that SGI did not think there was merit to plaintiff's complaint.  7/1/16 Email from Ellermets to Michael Culver, Ex. 34 to Pl.'s Opp. [Dkt. # 24-31].  The thrust of the email seems to be that SGI was handling what it considered "personnel issue."  *Id.*  Glover also testified that the AOUSC did not conduct any investigation into him.  Glover Dep. at 97:13–16.  Thus, there is some evidence that could lead a jury to conclude that SGI minimized the issue, leading the AOUSC to decide it did not need to take any action.

There is case law that states that "an employer's investigation of a sexual harassment complaint is not a gratuitous or optional undertaking; under federal law, an employer's failure to

---

11      Glover also testified that Shumake came to talk to him, stating that SGI was investigating a complaint made by plaintiff against him.  Glover Dep. at 93:3–96:12.  Glover stated that Shumake told him they didn't find anything to support the allegations.  *Id.* at 95:4–7.  It is not clear when this conversation occurred.

investigate may allow a jury to impose liability on the employer." *Malik v. Carrier Corp.*, 202 F.3d 97, 105 (2d Cir. 2000); *see also Lipscomb v. Winter*, 577 F.Supp.2d 258, 277 (D.D.C. 2008) (explaining that regardless of an employee's protests, an employer maintains a duty to investigate every claim of sexual harassment). Here, there is evidence that several of plaintiff's supervisors, including Lee-Anthony, Grogan, Morton, and Hayes knew about Glover's conduct. And when she filed a formal complaint, the record suggests that SGI did not take action for four months. Thus, a reasonable jury could conclude that SGI failed to respond adequately to the allegations of third-party harassment in the workplace, and that the alleged harassment is actionable under Title VII. The Court will deny defendant's motion for summary judgment on plaintiff's discriminatory hostile work environment claim.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment will be denied in part and granted in part. Plaintiff's discrimination claim, count I, will proceed only on the ground that she was removed from the Victor 2 position, but not on any of the other alleged adverse actions. Plaintiff's retaliation claim, count II, will move forward only based upon her removal from the Victor 2 position and her placement on unpaid leave. Finally, plaintiff's hostile work environment claim, count III, will move forward based on discrimination, not retaliation.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: September 30, 2019